IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 20-CR-329-CVE |
| TRAVIS PRYCE, | |
| Defendant. | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NON-GUIDELINE SENTENCE AND NOTICE OF MANDATORY DETENTION

### I. INTRODUCTION

The United States of America, by and through Christopher J. Nassar, Assistant United States Attorney for the Northern District of Oklahoma, hereby submits the following response for consideration by the Court.

Pursuant to 18 U.S.C. § 3553(a) and Section 6A1.2 of the Sentencing Guidelines and Policy Statements, the United States hereby represents that it has reviewed the Probation Office's presentence report in this matter, and that it does not dispute any of the facts or factors set out therein.

Defendant has pleaded guilty without a plea agreement to Distribution and Receipt of Child Pornography. Defendant's calculated offense level is calculated at 34, which with a criminal history computation of category I, results in a recommended guideline range sentence of 151-188 months.

1

## II. <u>STATEMENT IN SUPPORT OF A SENTENCE - 18 U.S.C. § 3553(a)</u>

The Government respectfully requests that the Court sentence Defendant to a term of imprisonment within his currently calculated guideline, 15 years of supervised release, in addition to ordering of a $1,000 special assessment under 18 U.S.C. § 2259A, as there are no identified victims requesting restitution.

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. U.S., 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Id. In calculating the appropriate advisory guideline range, the district court should consider all relevant conduct proven by a preponderance of the evidence. Relevant conduct under the Guidelines thus " 'comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct.' " *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1095 (10th Cir.2007) (quoting *United States v. Allen*, 488 F.3d 1244, 1254-55 (10th Cir.2007)). After determining the applicable advisory Guideline range, the district court must then consider the sentencing factors pursuant to 18 U.S.C. § 3553(a) to shape an appropriate sentence.

A guideline sentence satisfies the factors of 18 U.S.C. § 3553(a) yet does not represent a sentence unmoored from the recommendations of the Sentencing Guidelines.

## a.  <u>Nature and Circumstances of the Offense</u>

In August of 2020, the Department of Homeland Security Investigations (HSI) and TPD-Cyber unit conducted an undercover peer to peer file sharing investigation into online sharing of child sexual abuse material. Using file sharing programs, officers downloaded several files of child sexual abuse material from an IP address that placed the distributor in Copan, Oklahoma. One of these files was video that showed a nude female child, between eight to twelve years old, placing her fingers in her mouth and vagina.  Officers downloaded child sexual abuse material from this IP address on seven additional occasions.

Officers identified the registrant of the account as Defendant's mother and executed a search warrant at his house on September 30, 2020.  Multiple computer and electronic devices were seized for later examination.  Several handwritten notes, index cards, and journals were also discovered, which contained lists of known collections or series of child pornography and several lists of female names. The lists contain several known child pornography terms such as "Lolita[1]," "LS[2]," "preteen," "loli[3]," "kidz," "11yo," "babies," and "ptsc[4]."

Defendant was mirandized and confessed to using file sharing programs to download child sexual abuse material of children as young as five years old. He further stated that he had masturbated to a video depicting the sexual abuse of a ten-

---

[1] 1955 novel where an adult male has a sexual relationship with a 12-year-old girl. A common search term for child sexual abuse material depicting adult men abusing young girls.
[2] "Lolita Series"
[3] "Lolita"
[4] "Pre-teen Soft Core"

3

year-old child. Defendant stated he had been engaged in this behavior for "a few years".

In total, Defendant was found to possess 2,930 images and 3.5 hours of video footage depicting graphic sexual abuse of children, including depictions of sadomasochistic abuse. (See Attachment 1, supplemental report)

**b.  History and characteristics of the defendant**

In contrast to many defendants appearing before this Court and others, Defendant had a normal childhood and a supportive family. There is no indication in the presentence report that Defendant suffered any abuse in his formative years. He has no history of mental or emotional disorders.  There was nothing stopping Defendant from being an asset to the community, but instead he decided to engage in the trading of child sexual abuse material for several years. Defendant highlights his lack of criminal history, which is unremarkable as 75.9% of child pornography defendants have no criminal history.[5]

**c.  The need for the sentence to reflect seriousness of the offense, respect for the law, provide just punishment.**

This factor seeks to answer the need for retribution so that the punishment fits the crime and the defendant is punished justly.  *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010).  The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's

---

[5] United States Sentencing Commission, *Quick Facts on Child Pornography Offenders,* 2019

standpoint, the sentence should be of a type and length that will
adequately reflect, among other things, the harm done or threatened by
the offense, and the public interest in preventing a recurrence of the
offense.    (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N.
3258-59). *Id.*

When weighing the § 3553 factors, courts look at the severity and/or

number of images when deciding the defendant's appropriate sentence.  First

and foremost, the Fifth Circuit recognized this fact when it stated in *United*

*States v. Miller*, 665 F.3d 114, 123 (5th Cir. 2011):

> We also disagree that it is illogical to differentiate between defendants
> who view or distribute images of prepubescent children being raped and
> sodomized, as one example under the Guidelines, and those defendants
> who view or distribute pornography that depicts minors who are not
> prepubescent engaged in sexual activity that is not violent or sadistic.  We
> reject the view that because there are many defendants who view images
> of children under the age of 12 being raped and sodomized, and because
> there are many defendants who obtain hundreds of pornographic images
> of children, the terms of imprisonment should be reduced for all who
> receive or transport child pornography, regardless of the content of those
> images and regardless of the number of images.  The Guidelines treat
> differing behavior differently, and in our view, that differentiation is not
> unreasonable.

Here, Defendant was caught with thousands of images and hours of video

footage depicting the sexual abuse of children as young as eight, including

sadomasochistic abuse, which qualifies him for all enhancements under the USSG

2G2.2. It is true that the court sees many cases that include all the enhancements;

however, this is due to investigating agencies opting for federal prosecution of the

most serious offenders. These offenses can be prosecuted by state authorities is most

cases, but investigators typically only present cases involving offenders who do not

qualify for all the federal sentencing enhancements to local district attorneys' offices.

The problem behind internet trading of child sexual abuse material is endemic, with more than 65 million files being reported to the National Center for Missing and Exploited Children in 2020.[6] Those 65 million reported files are just a small fraction of the child sexual abuse material trafficked every year. Of all the perpetrators of this offense, Defendant is one of the most serious and he should be sentenced accordingly, to reflect the public interest in preventing recurrences and further expansion of this conduct.

### d. Deter future criminal conduct by defendant and others, and to protect the public from further crimes of the defendant.

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *Irey*, 612 F.3d at 1206, (citing *United States v. Ferber*, 458 U.S. 747, 760 (1982) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product"); *Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("Deterring the production of child pornography and protecting the children who are victimized by it are factors

---

[6] *NCMEC 2020 Exploitation Statistics*, https://www.missingkids.org/gethelpnow/cybertipline (February 24, 2021)

that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").  In *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007), the court opined that:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded – both consumed himself and disseminated to others.  The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor.  The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Sixth Circuit has reversed a district court that failed to see any importance in general deterrence.  *See United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012).  The district court stated, "general deterrence ... will have little [if] anything to do with this particular case."  *Id.*  The Sixth Circuit found the district court's statement "inexplicable and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]"  *Id.* (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Defendant and others who have a sexual attraction to young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Defendant receives a low sentence.  These offenders do talk to each other via the Internet and they are

7

concerned about law enforcement – many using virtual private networks, anonymizing browsers and applications, and encryption to prevent detection. There is much to be gained by a significant sentence - increased safety for children who are targets for further production of sexual abuse material by decreasing the demand for such material.

The Court is in the position to send a message loud and clear to those individuals like Defendant who share a sexual gratification in watching the exploitation of children and seek further access to children as Defendant did. No general deterrence is gained by a mere slap on the wrist or minimum sentence.  These are serious crimes and should be treated as such.  A below guideline sentence would not achieve the deterrence necessary for other offenders like Defendant, who may consider engaging in this activity.

## III.    Recidivism

Defendant's motion claims that he is a low risk for recidivism due to his age and family support. While, Defendant provides no empirical support for his claim, multiple studies have highlighted the difficulty with calculating accurate recidivism rates for child pornography offenders, as well as finding that such offenders often pose a greater risk for reoffending with both computer and contact offenses than previously thought.

First on age, studies have shown that for sex offenders "advanced age should not be considered as a post actuarial mitigating factor" for risk of reoffending. G. Harris and M. Rice, *Adjusting Actuarial Violence Risk Assessments Based on Aging or the*

*Passage of Time*, 34 Crim. J. and Behav., 310-11, (2007). Defendant's age at release provides no indication he will not remain a risk for reoffending.

For recidivism risk generally, it is well established that child pornography offenses and sex offenses against children in general are systematically under reported and, because they are typically committed in the privacy of an offender's home without any witnesses, are particularly difficult to detect. This vast under reporting of sexual offenses involving children, including child pornography offenses, has been called the base rate problem. The base rate in general is the naturally occurring rate of a condition or phenomenon in a given population. Stated another way base rate is the relative frequency which a state or condition occurs in a given population. Thus, when endeavoring to study sex offenders or more specifically child sex offenders, one must first determine the relative frequency with which they sexually offend. The problem with studying sex offenders is that it is extremely difficult, if not impossible, to determine reliably the number of offenses they have committed due to the vast under reporting of these types of offenses and the difficulty in detecting them when most occur in private behind closed doors. Thus, the base rate is extremely difficult, if not impossible to accurately determine. This in turn significantly hampers the reliability of any study of sex offenders in general and child sex offenders more specifically.

The widespread under reporting of sexual abuse has been widely recognized by those studying sex offenders. Recidivism studies based on reconviction rates for sex offenders "seriously underestimate the frequency that the acts in question occur."

Dennis Doren, *"Recidivism Base Rates, Predictions of Sex Offender Recidivism, and the "Sexual Predator" Commitment Laws"*, Behavioral Sciences and the Law, 16, p. 99 (1998). One study described the well recognized under reporting of child sex abuse follows:

> Our reliance on official records for both criminal history and reoffending may have limited the strength of the association that we could find, as both are underestimates of true offending. Although our offense information was extensive, with the use of both police occurrence information and criminal record database information, there were still municipal, regional, provincial, and national police and other justice services that an offender may have contact with of which we were unaware. Also, not all charges or convictions are necessarily listed on, described, or submitted to, national criminal records (e.g., nonviolent cases involving diversion from the justice system, charges or convictions deleted after specified periods of time including some juvenile records, convictions removed after an offender receives a pardon) and they may be recorded or processed at different times. These limitations are not unique to this follow-up study and are considerations for all research involving criminal justice information.
>
> Historical cases of sexual contact offenses, especially those committed by child pornography offenders whom appeared to have no prior criminal history, may provide a window into undetected sexual offending; offenses that were not (at the time) reported to police or documented in file information. As we previously mentioned, 12% of child pornography offenders in the meta-analysis by Seto et al. (in press) had an official record of prior contact sexual offenses, but half of the child pornography offenders in the smaller subset of studies with self-report information admitted having sexual contacts with children.

Eke, Seto and Williams, *Examining the Criminal History and Future Offending of Child Pornography Offenders: An Extended Prospective Follow-up Study*, Law and Human Behavior 476 (2011); *See* Seto, Hanson and Babchishin, *Contact Sexual Offending by Men With Online Sexual Offenses,* Sexual Abuse: A Journal of Research and Treatment 23, 135 (2011) (approximately 1 in 8 online offenders have a known contact sexual

offense history but approximately fifty percent of offenders self report a contact sexual offense).

Another study found that victim-survey research indicates that "as few as 5% and considerably less than 41% of adolescent and adult sexual assault victims report their victimization to the police, while fewer than 30% of child sexual assaults are reported to the police." Susan Sachsenmaier, *The Basis for Extrapolation in Sexual Offender Risk for Recidivism Assessment*, 6 (July 21, 2010). Moreover, studies which compared the number of victims officially known to authorities to the number of victims revealed by offenders' self-report (coupled with polygraphing and/or promises of confidentiality/immunity) showed that "only 2 to 15% of sexual assault victims are known to officials and only 1.5 to 53% of sexual offenses result in an official record, with the average being much closer to the lower number." *Id.* at 10; *See* Babchishin, Hanson and Hermann, *The Characteristics of Online Sex Offenders: A Meta-Analysis*, Sexual Abuse: A Journal of Research and Treatment, 110 (July 26, 2010).

Clinical psychologists Michael Bourke of the USMS and Andres Hernandez of the BOP conducted a study that compared two groups of child pornography offenders participating in a voluntary prison treatment program: men whose known sexual offense history at the time of sentencing involved the possession, receipt or distribution of child abuse images, but did not include any contact sexual abuse; and men convicted of similar offenses who had documented histories of contact sexual offending against at least one child victim. Bourke and Hernandez, *The 'Butner*

11

*Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, Journal of Family Violence, Volume 24, Issue 3 (April 2009). The study involved 155 sex offenders that had enrolled in an intensive, residential sex offender treatment program, 115 of whom had no documented history of known contact sex offenses when sentenced. *Cunningham*, 680 F.Supp.2d at 859. The other 40 offenders had revealed 75 victims when sentenced. By the conclusion of the therapy, only 24 offenders still denied committing a contact sex offense. Stated differently, 91 of 115 that had previously denied such conduct admitted to contact offending during treatment. *Id.* The average number of victims revealed by those who had previously denied contact offenses was 8.7. Those that previously admitted contact victims disclosed an average of 19.4 victims. The study went on to note that of the 24 offenders that continued to deny any hands-on offenses, nine were polygraphed on the issue. Only two of those nine passed. *Id.* "The dramatic increase (2,369%) in the number of contact sexual offenses acknowledged by the treatment participants challenges the often-repeated assertion that child pornography offenders are 'only' involved with 'pictures'". *Id.*

In addition, the Sentencing Commission's research involved a cohort of offenders who had been released from prison as little as 24 months prior to the study, but, sex offenders may take longer periods to reoffend. *Id.* Moreover, the recent evolution of the technology that facilitates child pornography crimes further undermines the predictive power of past studies focused on a cohort of offenders who lacked access to current technological tools which make it far easier to amass

12

child pornography and hide your activity from law enforcement.  For example, an offender, once caught through an online investigation, would be more likely subsequently to utilize techniques like open wireless, public hot spots, proxies, anonymous networks, and encryption, many of which have been widely adopted only during the last few years, and all of which make detection by law enforcement considerably more difficult.

Congress has repeatedly recognized that recidivism rates are particularly high for sex offenders. Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009)(compiling Congressional statements regarding the high risk of recidivism among child sex offenders).   Courts have recognized this as well.  The Eleventh Circuit has noted that "child sex offenders have appalling rates of recidivism and their crimes are under-reported." *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders). As Judge Posner wrote:

> We need evidence-driven law just as we need evidence-driven medicine. **Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children**. Some studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent.  Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child-pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years.

*United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) (emphasis supplied, internal citations removed). One study of sex offenders found an overall recidivism rate of 31.7%. Kingston, Drew, et. al., *Pornography Use and Sexual Aggression: The Impact of Frequency and Type of Pornography Use on Recidivism Among Sexual Offenders*, Aggressive Behavior, Volume 34 (2008). The anticipated likelihood of recidivism increased by 177% among the offenders that viewed deviant pornography such as child pornography. The predicted odds of violent recidivism increased by 185% for those viewing deviant pornography and the predicted odds for sexual recidivism increased 233% for those viewing deviant pornography. This heightened risk of recidivism among sex offenders has been found in other studies. Hanson, R. Karl and Bussiere, *Predictors of Sexual Recidivism: A Meta-Analysis*, (1996).

Dr. Gene Abel is a well-known psychiatrist and widely respected leader in the field of diagnosing and treating sexual problems. He is considered by many to be the leading psychophysiology researcher in studies of sexual behavior problems in the United States. He testified before the Sentencing Commission at a public hearing on February 15, 2012, addressing federal child pornography offenses. His presentation included the following conclusions:

- Those who use child pornography are more likely to molest children
- Those who solicit minors are more likely to molest children
- Those referred for child pornography or sexually chatting with/traveling to meet minors are less likely to admit child molestation
- Those trying to present themselves in a positive light are less likely to admit child molestation.

14

Dr. Abel was also presented with a series of questions by the Sentencing
Commission. One of the questions he was asked was "Are there valid risk
assessment instruments to predict sexual recidivism by child pornography offenders."
His response was "No". Gene Abel, M.D., Medical Director, Behavioral Medicine
Institute, *Sentencing Commission Testimony*, at 87 (Feb. 15, 2012).

c. **It is far from clear that child pornography offenders can be successfully**
   **treated.**

While Defendant should be commended for compliance with psychological
treatment directed by the US Probation office, it is unclear if such treatment can
have a permanent lasting effect. A review published in the journal Evidence Based
Mental Health asked the question *"Do psychological interventions reduce sexual offences in
adults who have offended before or are at risk of offending?"* Evidence Based Mental
Health (April 20, 2013). The review, which involved meta-analysis of ten random
clinical trials (RCTs), concluded that "[c]urrently RCT evidence does not support
that psychological interventions reduce the risk of sexual reoffending." *Id.*

With respect to rehabilitation, the research and data are inconclusive at best.
Dr. Abel testified to the Sentencing Commission that for some offenders, a lifetime
of treatment and formal maintenance is required, and could not conclude d that his,
or any other, proposed treatment plan will definitively reduce recidivism by child
pornography offenders. Dr. Abel Testimony at 92-93 (Feb. 15, 2012).

Dr. Abel cautions that for any treatment program to be successful, the typical
offender should receive at least five to ten years of treatment, with at least 120

contacts between the offender and the treatment provider. Thus, even assuming rehabilitation will ultimately prove successful (an assumption that is unsupported by a clear scientific consensus) the risk posed by a typical offender could remain acute for the first five to ten years. Moreover, such a program would require close supervision, including frequent home visits, consistent monitoring of computer use, and regular polygraph testing. *Id.* at 136-137 There is no certainty that federal probation officers will have the resources to undertake such a level of supervision. In addition, considering that the technological sophistication of offenders is continuously increasing, along with the forensic tools available to those offenders to evade detection. James Fottrell and Steve DeBrota, *Sentencing Commission Testimony*, at 24-28 (Feb. 15, 2012). There is no guarantee that even the savviest probation officer would be able to effectively track offenders' post-incarceration behavior.

In light of the limited state of the current data, there is no basis to conclude that treatment will necessarily reduce the recidivism risk of child pornography offenders over their lifetimes, nor any evidence that any particular course of treatment has proven to be effective in the long term. There is accordingly no basis to rely upon the promise of rehabilitation through therapy, particularly where children bear the risk of suffering severe harm should assumptions about the efficacy of rehabilitation prove to be incorrect.

IV.   <u>USSG § 2G2.2(b)(6)—USE OF A COMPUTER ENHANCEMENT</u>

The court should not vary downward two levels in order to deduct the use of a

computer enhancement, as the enhancement is not duplicative to the base offense level, regardless of the frequency of its application.

Following the passage of the PROTECT Act in 2003, the US Sentencing Commission conducted a number of studies regarding the Guidelines, including use of a computer by offender and implementing appropriate base offense levels that took into account the five-year statutory mandatory minimum for distribution and receipt of child pornography.[7]

After engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses, the Commission took the most lenient option of those typically used by the Commission to create guidelines for mandatory minimum offenses. Specifically setting the base offense level for distribution and receipt below the mandatory minimum at a level 22. The Commission's analysis revealed that a majority of offenders sentenced under § 2G2.2 were subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2–level enhancement for use of a computer (89.4%) and a 2–level enhancement for material involving a child under 12 (91.4%).[8] *Id*. at 45-46.

---

[7]  *The History of the Child Pornography Guidelines*, USSC, at 41-42, (2009) Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf

[8]  The publication relied on statistics from 2009. FY2020 statistics are 94.2% for use of computer and 93.6% for under 12. See: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf

The Federal Public Defender's office agreed that setting the base offense levels below the mandatory minimum was appropriate. *Id.* at 47. The Commission's research and review of comments indicated that if it placed the base offense level at 26, or even 24, after applying the typical enhancements, most first-time offenders' Guidelines calculations would be far in excess of the mandatory minimum. However, setting the base offense level at level 22 would permit the Guidelines and enhancements to operate in conjunction with the statutory mandatory minimum. *Id.*

There is no dispute that certain enhancements apply in nearly every child pornography case. The 2–level enhancement for use of a computer applies in 94.2% of cases. The 2–level enhancement for images involving a prepubescent child applies in 93.6% of cases. The enhancement for possessing sadistic or masochistic images applies in over 57% of cases.[9] There is an argument, cited in the PSR, that downward variances are warranted based on the frequency of the application of these enhancements. However, this argument suffers from several fatal flaws.

As previously stated, the frequency of § 2G2.2 enhancements, including the use-of-a-computer enhancement, was expressly acknowledged by the Commission when it set the base offense levels for these offenses. The Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels. The base offense level for a distribution conviction is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months below the mandatory

---

[9] *Id.*

minimum. The bottom of the Guideline range remains below the mandatory minimum until a 4–level increase to offense level 26, resulting in a 63 to 78-month range. Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense. In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum. If the Court factors in acceptance of responsibility, an additional 3–level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum. In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the mandatory minimum with only a 3–month variance. The Court, should therefore, afford little weight to the fact that some enhancements apply in nearly every instance. It is clear that the Guidelines have taken this factor into account.

Additionally, the fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines. The frequency argument could equally be applied to the majority of the enhancements in § 2G2.2, some of which are applied as often as the use-of-a-computer enhancement. This shows the slippery slope of the frequency argument for § 2G2.2 enhancements, which will logically conclude with an argument that none of the frequent enhancements should apply in a defendant's case. Courts typically do not provide deference to a defendant simply because he chooses the most convenient and common way to commit a crime. Robberies and carjackings are most frequently facilitated with firearms, however,

courts do not deduct the firearm enhancement under 2B3.1(b)(2)(B) simply because the most common tool was used in the offense. This Court, should therefore, not alter its sentence simply because advancing technology has made the use of a computer the easiest and most frequently used method of accessing child pornography.

In addition to the fact that the US Sentencing Commission has factored in the USSG § 2G2.2(b)(6) "use-of-a-computer" enhancement in the guidelines and persistently continued to include in subsequent guideline manuals, Circuit Courts across the country have consistently "rejected the idea that the enhancement should be ignored because it so frequently applies". *United States v. Walters*, 775 F.3d 778, 786 (6th Cir. 2015). Simply put, the argument that "'[c]omputers are present in every case' . . . [does] not begin to approach the showing necessary for a court to 'declin[e] to apply § 2G2.2 out of hand.'" *United States v. Bistline*, 720 F.3d 631, 633 (6th Cir. 2013) (quoting *United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012) (vacating a sentence imposed by a district court that had accepted a similar argument regarding this § 2G2.2 enhancement).

The argument that § 2G2.2(b)(6) is double-counting or in the alternative should not be considered or greatly discounted because it applies in virtually every case is "meritless" and has been rejected by the 10th Circuit Court of Appeals on multiple occasions. *United States v. Traufield*, 768 F. App'x 802, 809 (10th Cir. 2019) *See also See United States v. Miller*, 318 F. App'x 701, 702-03 (10th Cir. 2009) (unpublished) (concluding that there was no improper double counting of criminal

conduct because the defendant "could have been sentenced under § 2G2.2(a)(2) without having used a computer" and therefore "enhancing punishment for that specific and additional conduct is not prohibited").

In accordance with the history of the Sentencing Commission's construction USSG § 2G2.2 and appellate caselaw, the Court show maintain the USSG § 2G2.2(b)(6) use-of-a-computer enhancement in Defendant's case.

## V. <u>REMAND TO CUSTODY</u>

The United States advises both the Court and the defendant that upon the defendant's sentencing for the crimes of conviction, federal law requires that he be remanded to custody upon sentencing or pending his appeal, if any.

Title 18, United States Code, Section 3143(a) governs the release or detention of a defendant pending sentencing.  That law provides in relevant part:

(2) The judicial officer *shall* order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless –

(A)(i)  the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

(ii)  an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; *and*

(B)  the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2) (emphasis added).

In this case, Defendant has been convicted of a charge that falls under the umbrella of this statute. That is because the charge – knowing distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) – is a felony child pornography offense listed in Chapter 110 of the criminal code, which for purposes of Sections 3141 through 3150, is considered a "crime of violence." *See* 18 U.S.C. § 3156(a)(4)(C) (defining the term "crime of violence" to include "any felony under chapter ... 110"). The clear language of Section 3143(a)(2) applies to any person who has been convicted of an offense listed in Section 3142(f)(1)(A), which includes "a crime of violence." *See* 18 U.S.C. § 3142(f)(1)(A); *see also generally United States v. Sharp*, 517 F. Supp. 2d 462, 463 (D.D.C. 2007) (applying the same analysis to Chapter 110 felony convictions).

The law provides three possible exceptions to the application of Section 3143(a)(2), and none of them apply to Defendant. First, the Court could find a substantial likelihood that a motion for acquittal or new trial would be granted. See 18 U.S.C. § 3143(a)(2)(A)(i). Second, the undersigned attorney for the Government could recommend that no sentence of imprisonment be imposed. See 18 U.S.C. § 3143(a)(2)(A)(ii). Barring either event, the Court would be required to detain the defendant until his sentencing unless the third exception applied – that is, that the defendant could clearly show that there are "exceptional reasons why [his] detention would not be appropriate." See 18 U.S.C. § 3145(c).

"Exceptional" is defined as "being out of the ordinary: uncommon, rare." *United States v. Wages*, 271 F. App'x 726, 727 (10th Cir. 2008). Advanced age, lack of

22

criminal history, physical disabilities, ongoing mental health or medical treatment, care of family members, convenience of self-surrender to the defendant or the Marshalls Service, have all been specifically rejected as unexceptional by the Tenth Circuit and other appellate courts. Id. at 728. In fact, *Wages* specifically analyzed 18 U.S.C. § 3145(c) in regard to a child pornography defendant.

None of the enumerated exceptions apply to Defendant, therefore it is statutorily required that the Defendant be remanded to custody at sentencing.

Alternatively, the court could find that Title 18, United States Code, Section 3143(b) governs the release or detention of a defendant pending sentencing.  That law provides in relevant part:

> (2) The judicial officer *shall* order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

18 U.S.C. § 3143(b)(2) (emphasis added).

This section is subject only to the previously discussed 18 U.S.C. § 3145(c) "exceptional circumstances" exception, which Defendant cannot meet. Accordingly, Defendant should be remanded to custody following sentencing.

## VI.    CONCLUSION

The Supreme Court, Congress, and courts across the country have repeatedly recognized the pain and suffering caused by the sexual exploitation of children. These children are not abstractions or mere digital files, they are real people who

experienced rape, molestation, and exploitation in order for these pictures and videos to be produced. For years, Defendant used the internet to collect the suffering of those children from around the world as a hobby.

The Government respectfully requests that the Court sentence Defendant to a term of imprisonment within his currently calculated guideline, 15 years of supervised release, in addition to ordering of a $1,000 special assessment under 18 U.S.C. § 2259A, as there are no identified victims requesting restitution.

Respectfully submitted,

CLINTON J. JOHNSON
ACTING UNITED STATES ATTORNEY

*/s/ Christopher J. Nassar*
Christopher J. Nassar, OBA #31167
Assistant United States Attorney
110 West Seventh Street, Suite 300
Tulsa, OK  74119
Telephone:  918.382.2700
Facsimile:  918.560.7939

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2021, the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing under seal and emailed to the following.

Rob Ridenour
*Counsel for Defendant*

/s/ *Christopher J. Nassar*
Christopher J. Nassar
Assistant United States Attorney

1

# Tulsa Police Department
## *SUPPLEMENTAL OFFENSE REPORT*

BPAG 05/08/2006

**VICTIM:** Pryce, Travis                                    **FILE #** 2020-059230
**ADDRESS:** 398411 W. 900 Road, Copan, OK
**PHONE:**

**CRIME TYPE:** Possession of Child Pornography
**LOCATION:** 398411 W. 900 Road, Copan, OK
**DATE OF OCCURRENCE:** September 30, 2020

**DETECTIVE ASSIGNED:** Det. J. Jennings
**DATE OF REPORT:** December 7, 2020

**DETAILS:**

Below is a sampling of ten of the videos discovered on Travis Pryce's Nextbook Tablet.

1. The video is entitled "[JulyJailbait] – [jjclubumn7vkhyuw.onion] – Polarlights studio – Quartet2 part1" and is 15 minutes and 5 seconds. The video displays a nude juvenile male, approximately between the ages of six and ten, with his penis exposed. The video then displays a nude juvenile female, approximately between the ages of six and ten, with her breasts and genitals exposed. The female child touches the male child's penis with her hand and then places the male child's penis into her mouth. The female child then climbs onto the male child and the male child attempts to place his penis into the female child. A second nude juvenile female, approximately between the ages of eight and twelve, with breasts and genitals exposed, then places the male child's penis in her mouth. The second female child then climbs onto the male child and places his penis into her genitals. Then the second female child uses her hand and mouth on the male child's genitals while the first female child uses her hand and mouth on the genitals of the second female child. A third nude female child, approximately between the ages of six and ten, with breasts and genitals exposed, then begins to play with the male child's penis as well.

2. The video is entitled "[JulyJailbait] – [jjclubumn7vkhyuw.onion] – Polar Lights – Casey and Nikole BDSM (cn&b) 720p" and is 39 minutes and 58 seconds. The video displays two females, one approximately between the ages of fifteen and eighteen, and one a juvenile possibly between the ages of twelve and fourteen. The video shows the younger, juvenile female's arms bound by chains. The video goes on to show the older female, spanking and whipping the younger juvenile female while she wears lingerie. The older female then takes off the younger juvenile female's lingerie and continues to whip the girl while her genitals are displayed. The younger juvenile female then uses her mouth on the nipple of the older female, and then uses her hands, other instruments, and a strap on to penetrate the older female's genitals.

3. The video is entitled "[JulyJailbait.nl] – [jjclubumn7vkhyum.onion] – Stars & Stripes (New studio) – video 00103" and is 10 minutes and 25 seconds. The video

**Det. Jennings**                    **12/08/20**                    **1 of 3**

INCIDENT NUMBER 2020-059230

displays a juvenile female, approximately between the ages of eight and twelve, and an older female approximately between the ages of fifteen and nineteen. The video displays the younger juvenile female penetrating her exposed genitalia with her finger. The video then displays the older female undress the younger juvenile female exposing her breasts and all of her genitalia. The older female then touches and penetrates the younger juvenile female's genitalia with her hand and repeatedly places her mouth on the genitalia of the younger juvenile female.

4. The video is entitled "Custom (NK_008)" and is 38 minutes and 18 seconds. The video displays two nude juvenile females with breasts and genitals exposed. The younger juvenile female appears to be approximately between the ages of eight and eleven. The older juvenile female appears to be approximately between the ages of fourteen and sixteen. The video shows each child placing their mouth on the genitals of the other child, and each child penetrating the other child's genitals with an object.

5. The video is entitled "Custom (NK-MS-10)" and is 27 minutes and 48 seconds. The video displays two nude juvenile females with breasts and genitals exposed. The younger juvenile female appears to be approximately between the ages of eight and eleven. The older juvenile female appears to be approximately between the ages of twelve and fourteen. The video displays each child licking and placing their mouth on the genitals of the other child. The video also displays both juvenile females placing their mouths on penis shaped toys.

6. The video is entitled "1st-Studio Siberian Mouse (NK_006)" and is 26 minutes and 13 seconds. The video displays a juvenile female, approximately between the ages of nine and twelve. The juvenile female undresses exposing her breasts and genitals. The video displays the child using her hands and different objects to penetrate her genitals. The child also uses her mouth on a penis shaped object.

7. The video is entitled "HD_093 (MSH-02)" and is 12 minutes and 38 seconds. The video displays a nude juvenile female, approximately between the ages of twelve and fourteen, with her breasts and genitals exposed. The child uses her hands to touch her genitals. The juvenile female also uses an object to penetrate her genitals.

8. The video is entitled "Info Amateurz Mylola Nastia Pissing" and is 9 minutes and 53 seconds. The video displays a juvenile female, approximately between the ages of eleven and thirteen. The video displays the child undressing to expose her breasts and genitals. The video shows the child running her hands over her nude body and breasts. The video repeatedly gets closer and focuses on the child's exposed genitals. The video shows the child, still nude, with genitals exposed, squatting over a bucket on the floor and urinating into the bucket.

9. The video is entitled "Custom (Nk_04) and is 17 minutes and 11 seconds. The video displays a juvenile female, approximately between the ages of eight and twelve. The video displays the child undressing and exposing her breasts and

**Supplementary Offense Report**
**Victim**: Pryce, Travis
**Crime**: Possession of Child Pornography

Page 3 of 3

genitals. The child touches her exposed genitals with her hand. The child then uses a silver object and rubs it against her genitals.

10. The video is entitled "HD_096 (MSH-05)" and is 16 minutes and 6 seconds. The video displays a juvenile female, approximately between the ages of eleven and thirteen. The juvenile child undresses and exposes her breasts and genitals. The child then touches her genitals with her hand. The video then displays the child touching a silver object to her genitals and then attempting to penetrate herself with the silver object.

INCIDENT NUMBER
2020-059230

**Det. J. Jennings**                    **12/08/20**                    **3 of 3**